**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-1016
_____

UNITED STATES OF AMERICA

v.

ALBERT ANIN,
                              Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Crim. No. 11-cr-00240-001)
District Judge:  Honorable David S. Cercone
_____

Submitted Under Third Circuit LAR 34.1(a)
October 10, 2013
_____

Before: FUENTES, COWEN and BARRY, Circuit Judges

(Opinion Filed: November 15, 2013)
_____

OPINION
_____

BARRY, Circuit Judge

        Albert Anin ("Anin") was convicted following trial of conspiracy to distribute and

possess with intent to distribute one or more kilograms of heroin between October of

2009 and July of 2010.  The District Court found that Anin had conspired to possess or

distribute over three kilograms of heroin in total, and sentenced him to 130 months in prison. He now appeals.

Anin argues on appeal that (1) the evidence was insufficient to support his conviction, and that (2) the District Court improperly attributed to him two of the three kilograms it considered at sentencing, claiming that, as to that amount, he did not conspire with anyone other than Pittsburgh drug dealer Vernon Williams, the government's then-agent. We will affirm.

## I. Background

Anin, a Ghanian native and operator of an informal taxi service, worked as a driver for Williams before becoming Williams's primary source of heroin. According to Williams, Anin had long touted a connection to an importer of raw heroin from Ghana. Anin encouraged Williams to switch from an unreliable supplier of pre-packaged and pre-cut heroin to Anin's Ghanian contact, and to package and cut the drugs on his own to improve profits. Williams eventually agreed, and testified that he engaged in two transactions with Anin in the fall of 2009, securing along the way Anin's help in obtaining paraphernalia to package the drugs.

### A. The 2009 Transactions and Paraphernalia Purchase

In October 2009, Anin offered to sell Williams a half kilogram of raw heroin from the Ghanian contact for $47,000. Williams sought to finance part of the deal. He "got $10,000 together" and paid Anin, who gave him the drugs in exchange, A172, with the $37,000 balance payable directly to Anin's source. Later in 2009, Anin introduced

2

Williams to a store that sold drug paraphernalia in Youngstown, Ohio. Anin spoke to the store owner about Williams's needs; Williams then purchased several hundred dollars in supplies to cut the heroin and package it in smaller quantities for resale. Finally, at the end of November and into December of 2009, Williams bought another kilogram of raw heroin from Anin's source. He paid $95,000 to Anin, who in turn gave him the heroin, and soon repaid the balance owed from the October transaction.

### B. 2010 Controlled Calls and Meetings, and the May 24, 2010 Aborted Sale

In February 2010, Williams began cooperating with the Drug Enforcement Agency ("DEA"). During a February 16, 2010 recorded meeting, Williams sought Anin's help in arranging additional drug transactions, and in so doing elicited statements from Anin implicating himself, and his source. Anin informed Williams that he was "waiting and waiting" because the source was "on the halt," A603, and agreed to set up another deal as soon as he made contact. He and Williams also discussed how best to resell the drugs they would purchase. Williams preferred to sell the heroin raw, while Anin suggested that he "pump something to it, but just a little." A605. The two agreed, however, to speed up their distribution efforts by selling drugs in larger quantities, even though their margins would suffer. Anin estimated that they would need to fetch "somewhere, like, twenty, twenty seven" hundred dollars per ounce on resale in order to turn a profit, and expressed confidence the market could bear that price. Id.

Anin also stated that his source was well aware of Williams and his Pittsburgh operation. Anin claimed that his source thought Williams needed to slow down before

3

restocking, and had advised Anin and other buyers against cutting the heroin, preferring that they "sell it the way it is." A610. Anin also stated, and Williams testified, that the three had engaged in prior transactions. He described the source's last shipment as the "best stuff," id., and assured Williams that the source would be easier and cheaper to work with in the future.

Anin also claimed to play an indispensable role in the drug conspiracy: because of his connections in Ghana, he served as the exclusive link between the source and Pittsburgh dealers like Williams. Thus, Anin rebuffed Williams's request to deal with the source directly and assured Williams that he was the source's only outlet in the Pittsburgh area.

In the following months, Williams checked in with Anin on the status of the next deal. Finally, on May 23, 2010, Anin claimed his source's courier would be in Pittsburgh the next day with two kilograms of heroin to sell. The next morning Williams met Anin at his house, which was under DEA surveillance. Anin advised him that the courier would leave Pittsburgh at noon and "won't wait." A660. Williams claimed to need more time to put the money together and asked Anin to convince the courier to delay her departure. Anin then placed a call, speaking in Twi, a language native to Ghana. After hanging up, Anin reported that the courier was still planning to leave soon, and resolved to go there and talk to her, obtain a sample for Williams to try, and then call Williams. Anin never called. DEA Agent To, who surveilled Anin's house the day of the meeting, testified that Anin took a circuitous route to a friend's house after Williams's departure,

4

"walking aimlessly," making "sudden moves," and "peering" into vehicles as if he were "trying to identify . . . who may be behind the wheel." A126-27.

### C. Trial and Sentencing

In broad summary, at trial the government relied primarily on Williams's testimony and recordings of his conversations with Anin to prove the conspiracy. Anin testified that he was merely Williams's driver, that Williams purchased heroin from the Ghanian source on his own, and that Williams falsely named him as the supplier. He explained the recorded conversations about arranging buys as an attempt to appease and impress Williams, and claimed to have fabricated the May 24, 2010 sale (including the phone call to the courier) in an effort to exonerate himself: Anin hoped that "when police find out [he] didn't give [Williams] nothing," the government would conclude that Williams was lying about Anin being his source. A553.

The presentence report attributed 1.345 kilograms of heroin from the 2009 transactions to Anin's offense, calculated his base offense level at 32, and noted that his conviction carried a mandatory sentence of not less than 120 months. The government objected, claiming that the 2 kilograms from the May 24, 2010 transaction should be attributed to him as well. An amended report added the 2 kilograms, and accordingly increased the base offense level to 34, which, given Anin's lack of prior convictions, yielded a guidelines range of 151 to 188 months in prison.

On December 7, 2012, the District Court issued a tentative finding that the 2 kilograms should be attributed to Anin because "it is clear that the 2 kilograms were

5

being delivered by the same Ghanaian network that had supplied the 1.345 kilograms," and that that "network was an intricate, large-scale operation in which defendant had joined." A19. On December 17, 2012, the District Court adopted what had been its tentative finding, and sentenced Anin to 130 months in prison, downward departing because Anin was "different than other Defendants charged with drug trafficking in that it appears to some degree that [he] took opportunities that were presented to him as opposed to building an ongoing drug business or empire . . . ." A706.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 18 U.S.C. § 3742(a), and we have appellate jurisdiction under 28 U.S.C. § 1291.

Because Anin neither renewed his motion for a judgment of acquittal after the close of his case, nor moved to set aside the jury's verdict, his insufficiency claim has not been preserved. "Nonetheless, we will review the sufficiency of the evidence under the plain error standard because . . . the prosecution's failure to prove an essential element of the offense constitutes plain error under Rule 52(b) of the Federal Rules of Criminal Procedure." United States v. Wolfe, 245 F.3d 257, 261 (3d Cir. 2001). Under that standard, we "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." Id. We review factual findings, "including drug quantity determinations, for clear error, and a preponderance of the evidence must support the district court's determination." United States v. Gibbs, 190

6

F.3d 188, 203 (3d Cir. 1999) (citation omitted).

## III. Analysis

### A. Sufficiency of the Evidence

To prove a conspiracy under 21 U.S.C. § 846, the government must show "(1) a shared unity of purpose; (2) an intent to achieve a common goal; and (3) an agreement to work together toward the goal." United States v. Iglesias, 535 F.3d 150, 156 (3d Cir. 2008) (citation omitted). "[E]ven an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." Gibbs, 190 F.3d at 198 (citations and internal quotation marks omitted).

Anin argues "there is only the word of Mr. Williams to support" his involvement in a conspiracy to distribute the heroin obtained in the 2009 transactions, and that he "agreed with only a government informant regarding the contemplated May 24, 2010 sale," which he only "pretended to be setting up." Appellant's Br. at 40-41.

Williams's testimony casts Anin as a witting and even catalytic member of a conspiracy, involving both Williams and Anin's Ghanian source, to distribute raw heroin in quantities well in excess of one kilogram: Williams states that Anin introduced him to an importer of raw heroin from Ghana, bought 1.345 kilograms of heroin from the importer on credit and resold it to him over two transactions, helped him obtain materials to package the drugs for distribution in Pittsburgh, and agreed to facilitate further deals, including the aborted sale for two kilograms of heroin. That testimony was corroborated

7

by Anin's own recorded statements regarding past transactions with the source, arrangements for future deals, appropriate pricing on resale, whether to cut and in what size to package the heroin, and his role as Williams's crucial go-between.

Moreover, while there is no conspiracy "when an individual conspires to violate a law with only one other person, and that person is acting as a government informant," United States v. Conn, 907 F. Supp. 832, 837 n.5 (M.D. Pa.), aff'd, 68 F.3d 457 (3d Cir. 1995), the evidence demonstrates that Anin and Williams had become part of the Ghanaian source's larger operation. The two men engaged in multiple transactions with the source, who, in Anin's own words, (1) financed transactions for repayment after the drugs he supplied were resold, (2) preferred quick, uncut distribution, (3) would only trust Anin, (4) agreed to supply Anin and Williams more heroin in May of 2010. Anin's sufficiency claim fails.

**B. Attribution of 2 Additional Kilograms**

Although Anin never bought or sold the two kilograms at issue in the May 24, 2010 uncompleted transaction, the District Court reasoned that Anin was responsible as an accomplice under §1B1.3 of the sentencing guidelines. In a case involving "jointly undertaken criminal activity," §1B1.3 requires a sentencing court to consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3(a)(1)(A). Thus, §1B1.3 "directs the sentencing court to include in the base offense level certain amounts in addition to those amounts the

8

defendant was convicted of distributing," including "amounts of drugs possessed, distributed, manufactured, sold, or otherwise 'handled' by persons other than the defendant . . . within the scope and in furtherance of the activity the defendant agreed to undertake." United States v. Collado, 975 F.2d 985, 990-91, 995 (3d Cir. 1992).

As the District Court found, Anin was an active member of his source's operation on May 24, 2010. His source, through a courier, brought two kilograms of heroin to Pittsburgh for further distribution. While there is no evidence that the source ever sold that heroin, the courier's mere possession of it was a foreseeable result of Anin's efforts, and easily falls within the scope of, and occurred in furtherance of, the criminal activity Anin agreed to undertake: Anin's role in the conspiracy was to link the source to a local Pittsburgh dealer, and Anin had already spoken to the source about purchasing the very drugs the courier brought to Pittsburgh. Thus, although the evidence does not support the District Court's finding that the source delivered the two kilograms in question, A19, it more than adequately supports the factual determination that Anin was a member of his source's network and therefore responsible as an accomplice for the source's conduct regarding the two kilograms at issue.[1]

---

[1] We also note that attribution of the 2 kilograms is a straightforward application of note 5 to § 2D1.1, which provides:

> In an offense involving an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense.

9

## IV. Conclusion

The judgment of sentence will be affirmed.