**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1900
_____

UNITED STATES OF AMERICA

v.

DONALD WOMACK, SR.,
a/k/a ROCK,

                    Appellant
_____

On Appeal from the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 2-14-cr-00496-002)
District Judge:  Honorable Gerald A. McHugh
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
September 6, 2022

Before:  JORDAN, HARDIMAN, and MATEY, *Circuit Judges*

(Filed:  September 22, 2022)
_____

OPINION*
_____

_____

   * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Donald Womack, Sr., challenges his conviction for conspiracy, and, with respect to his sentencing, also challenges the attribution of eighteen kilograms of cocaine to him for his part in that conspiracy. Because his arguments lack merit, we will affirm.

## I.  BACKGROUND

In January 2014, federal authorities in the midst of a narcotics investigation in Chester, Pennsylvania uncovered what the District Court described as "a conspiracy to import several kilograms of cocaine from Mexico[.]" (App. at 11.) The plot came to their attention when they intercepted a text message that Womack sent to his cousin Paris Church on January 27.[1] That text message included a phone number for a person named Daniel who Womack believed was a cocaine supplier in Mexico, and it instructed Church to "[l]et [Daniel] know you're my cousin[.]" (App. at 332.)

Church made multiple attempts to get in touch with Daniel that day. His first few efforts involved some miscues: for example, the number Womack gave him was missing a digit. Womack checked in with Church multiple times throughout the day to see if Church had gotten through to Daniel and to remind Church to "tell him you [sic] my

---

[1] Federal agents had been authorized to wiretap Church's phones in December 2013, after he had been identified as part of a separate, larger investigation. That wiretap enabled federal agents to intercept both calls and text messages to and from Church's phones, capturing data about the intercepted communications, including dates, times, phone numbers, and audio in the case of calls. The District Court limited the government's ability to introduce evidence of the larger investigation at the trial in this case, and we do not address it here. Womack's appeal of his conviction resulting from that investigation is separately pending before us in appeal No. 16-1682.

cousin." (App. at 347.) Womack also told Church that Womack expected the cocaine deal with Daniel to be in "joints," which an agent with the Drug Enforcement Administration testified was a slang term for kilograms. (App. at 348.) Because Church had not yet made contact, Womack and his associate Nathaniel Coles separately reached out to Daniel, with each of them successfully getting in touch with him.

Church finally received a call from Daniel that evening. They discussed a plan for Daniel to get a shipment of cocaine across the border into the United States, where his courier would pass it off to Church in Houston. Daniel promised to have his courier deliver eighteen to twenty "pieces" (App. at 384) – another slang term for kilograms, according to the testifying DEA agent – and said he would follow up once he finalized the plans for his courier to get to Houston.

Minutes later, Womack called Church, who told him that "it's the real deal," that when Daniel "hit[s] me" – i.e., calls me back – "I'm gone," and things were "about to be popping[.]" (App. at 389-90.) Womack responded, "Say no more. I'm going to talk to you tomorrow." (App. at 390.) Church, along with his associate Michael Pinkney, then began to make arrangements to transport the cocaine from Houston to the Philadelphia and City of Chester area, where Church, Womack, Pinkney, and Coles were all based.

Daniel called Church two days later, and Daniel told him that the courier could be in Houston the following evening. But, said Daniel, Church first had to wire $300 to the courier via Western Union for expenses. Minutes later, Church and Womack had two calls in quick succession about the propriety of Daniel's request for $300. Womack expressed skepticism about paying the money but ultimately agreed with Church that

3

they were willing to run the risk that the deal was fraudulent. Church spoke to Daniel again later that day and completed the wire transfer.

Daniel then called Church two days later, saying that the courier was almost ready to depart and promising to call again once the car had crossed the border. After that, however, none of the conspirators heard from Daniel again. Church, Womack, and Coles made multiple unsuccessful attempts to contact him over the next several days, and they realized that he had taken the money without carrying out his part of the deal.

Pinkney, Church, Womack, and Coles were charged on September 17, 2014, in a single-count indictment for conspiring to possess with intent to distribute at least five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. The government relied on the conversations federal authorities had intercepted, as well as testimony from Pinkney, who struck a plea deal. All three remaining defendants were eventually convicted of conspiracy, and the District Court denied Womack's and Cole's mid-trial and post-trial motions for judgments of acquittal.

In calculating Womack's sentencing range, the District Court found, over Womack's objection, that Womack's base offense level included 18 kilograms of cocaine, given his role in the conspiracy. It sentenced him to 216 months' imprisonment.[2] Womack timely appealed.

---

[2] The District Court consolidated Womack's sentencing for the conviction that is the subject of this appeal with his conviction before us in appeal No. 16-1682, which presents discrete issues and does not involve a challenge to his base offense level. *See supra* note 1.

**II.    DISCUSSION**[3]

Womack argues that, because of his limited role in the conspiracy, there was insufficient evidence to support his conviction.  For similar reasons, he also says the District Court erred in attributing eighteen kilograms of cocaine to him at sentencing. The evidence showed, however, that his role in the cocaine conspiracy was not as limited as he claims.

**A.    There is Sufficient Evidence to Sustain Womack's Conviction**

Womack first argues that he, at most, introduced Church and Daniel to each other, and so there was insufficient evidence to prove that he was part of a conspiracy to distribute cocaine.  We review the sufficiency of the evidence underlying a conviction to see if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original).  Our review is "highly deferential," and we take care "not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (alteration in original).  Where the record may support "multiple possibilities," we draw all rational inferences in the prosecution's favor. *Id*. at 430-32.

---

[3] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

To prove that Womack was a member of a drug-trafficking conspiracy in violation of 21 U.S.C. § 846, the government needed to establish "(1) a shared unity of purpose between the alleged conspirators, (2) an intent to achieve a common goal, and (3) an agreement to work together toward that goal." *United States v. Bailey*, 840 F.3d 99, 108 (3d Cir. 2016). That last element – the requirement of an agreement – is "the essence of the [conspiracy] offense." *United States v. Tyson*, 653 F.3d 192, 206 (3d Cir. 2011) (alteration in original). Because conspirators "rarely leave evidence of an explicit understanding or common goal[,]" circumstantial evidence can suffice to establish the existence of a conspiratorial agreement. *Id*. at 208. Even so, merely introducing a buyer to a seller does not, without more, give rise to an agreement. *United States v. Pressler*, 256 F.3d 144, 153-54 (3d Cir. 2001).

Here, there is ample evidence from which a rational trier of fact could find that Womack did not merely introduce Church to Daniel, but rather agreed with Church and others to work toward obtaining large quantities of cocaine from Mexico in order to distribute it. Rather than stopping at sharing Daniel's number with Church, Womack persisted in working to put Church in touch with Daniel and told Church to make Daniel aware of Womack's and Church's familial relationship. Indeed, when Church could not get through to Daniel, Womack personally reached out to Daniel. Moreover, Church spoke with Womack minutes after arranging the deal with Daniel for eighteen to twenty kilograms of cocaine. Although Womack responded by telling him to "[s]ay no more" because Womack would talk to him the next day (App. at 390), a reasonable juror could infer that Womack wanted to hear the details of Church's call with Daniel in person

6

because he was being cautious for fear of surveillance. And, finally, Womack and Church spoke twice about Daniel's demand for pre-payment of $300, with Womack ultimately agreeing with Church that it was worth it to send the money. All that evidence was sufficient to allow a rational jury to infer not only that Womack was being kept abreast of developments with the deal but also that he had himself agreed to help obtain the cocaine from Daniel and was actively working to make the deal happen.

Womack argues that he was "never privy" to Church's conversations with Daniel about the details of the transaction. (Opening Br. at 22.) But "common sense suggests, and experience confirms, that illegal agreements are rarely, if ever, … verbalized with the precision that is characteristic of a written contract." *Tyson*, 653 F.3d at 208. The fact that Womack was "very careful" and used "guarded and coded language" and "cryptic" references would not have prevented a rational jury from inferring, based on the totality of the evidence, that Womack had agreed to participate in the conspiracy. *United States v. McGlory*, 968 F.2d 309, 322-23, 325-26 (3d Cir. 1992).

## B. The District Court Did Not Err in Attributing 18 Kilograms to Womack for Purposes of Sentencing

Womack next argues that, even if he is considered to be a conspirator, his role in the conspiracy was limited and the District Court erred in attributing to him eighteen kilograms of cocaine – the minimum amount Church and Daniel discussed. "We review for clear error the District Court's findings of fact regarding the relevant quantities of drugs attributable to the defendant." *United States v. Perez*, 280 F.3d 318, 352 (3d Cir. 2002). There is no clear error here.

7

In determining the drugs attributable to a defendant at sentencing, a court may consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant[.]" U.S.S.G. § 1B1.3(a)(1)(A). For conspiracies, a court may also look to "all acts and omissions of others" within the scope of the joint undertaking, in furtherance of the crime, and which are reasonably foreseeable. *Id*. § 1B1.3(a)(1)(B). In doing so, the court may not base its calculations on "mere speculation[.]" *United States v. Collado*, 975 F.2d 985, 998 (3d Cir. 1992). "While some degree of estimation must be permitted, the district court must satisfy itself that the evidentiary basis for its estimate has sufficient indicia of reliability." *United States v. Douglas*, 885 F.3d 145, 150-51 (3d Cir. 2018) (internal citation and quotation marks omitted). Courts may estimate drug quantity using a variety of evidentiary sources, including intercepted telephone conversations, *Collado*, 975 F.2d at 999, and the testimony of co-defendants. *United States v. Gibbs*, 190 F.3d 188, 203-04 (3d Cir. 1999).

Womack's primary claim of error – that he simply introduced Church to Daniel and then, effectively, washed his hands of the affair and so is not responsible for their dealings – repeats the same points made in his sufficiency-of-the evidence argument, as he admits. (Opening Br. at 28 (directing us to his "extensive[]" discussion on sufficiency).) As addressed above, however, that theory mischaracterizes the extent of the evidence of Womack's involvement in the scheme.

Moreover, contrary to Womack's assertion, the District Court conducted the necessary "searching and individualized inquiry into the circumstances surrounding [his] involvement in the conspiracy[.]" *Collado*, 975 F.2d at 995. Such an inquiry requires

that the court, before relying on a disputed point at sentencing, resolve the dispute after hearing the parties' positions and considering appropriate evidence. *United States v. Metro*, 882 F.3d 431, 442 (3d Cir. 2018); *United States v. Kluger*, 722 F.3d 549, 563 (3d Cir. 2013).

The District Court ably met that standard here, after evaluating the record and the parties' arguments. It relied in significant part on Church's discussion with Daniel about acquiring eighteen to twenty kilograms of cocaine and Womack's subsequent promise to talk to Church the next day, as well as testimony from Pinkney that the deal would be at least ten to twenty kilograms. (App. at 925-26.) The Court considered Womack's efforts to recharacterize the record but ultimately found "that there was a persistent effort to develop that connection [with Daniel] … and that the intent was to bring in substantial quantities in a range of 18 to 20 kilograms, if not more." (App. at 925-26.) Womack does not identify any clear errors of fact in that analysis. The sentencing challenge he brings here therefore fails.

## III. CONCLUSION

For the foregoing reasons, we will affirm.