

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-10-2000

# USA v. Duliga

Precedential or Non-Precedential:

Docket 99-5251

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"USA v. Duliga" (2000). *2000 Decisions.* Paper 28.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/28

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 10, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-5251

UNITED STATES OF AMERICA

v.

DANIEL DULIGA

        Appellant

Appeal from the United States District Court
For the District of New Jersey
D.C. No.: 96-cr-326
District Judge: Honorable Nicholas H. Politan

Before: GREENBERG, ROTH, and ROSENN,
Circuit Judges.

Submitted Under Third Circuit LAR 34.1(a)
January 25, 2000

(Filed February 10, 2000)

OPINION OF THE COURT

ROSENN, Circuit Judge.

This is an appeal from a judgment of conviction and
sentence in the United States District Court for the District
of New Jersey in connection with telemarketing operations.
The defendant, who was convicted on a multi-count
indictment charging conspiracy to commit mail and wire
frauds, contends that in imposing sentence, the district

court incorrectly determined his base level offense under
the United States Sentencing Guidelines by attributing to
him the entire amount of loss generated by the conspiracy
rather than the amount of loss he generated through his
own telemarketing efforts.

The district court had subject matter jurisdiction
pursuant to 18 U.S.C. S 3231. We have appellate
jurisdiction pursuant to 18 U.S.C. S 3742 and will affirm.

I.

A. The Telemarketing Scam

In December of 1990, Rita Holz, her husband Julius Schurkman, and a third person, Adie Lipton, set up All-Win Financial Corporation in Del Rey Beach, Florida. The company began operations in January of 1991. It then placed advertisements in newspapers across the nation advertising personal loans and debt consolidation. No advertisements, however, were placed locally. All-Win wished to avoid face-to-face confrontations with disgruntled clients.

The advertisements offered loans of up to $10,000, even to those with acute credit problems, and included a toll-free telephone number. When a prospective applicant called the toll-free number, a telemarketer would solicit basic background information from the applicant, including name, social security number, and any credit problems. The telemarketer would then ask the applicant to call back in approximately one hour so the loan could be processed. When the applicant called back, the telemarketer would congratulate the applicant and tell him that he had qualified for the loan. Of course, no processing occurred during that interval, and the time lapse between calls was merely pretextual.

After "approving" the applicant on the telephone, the telemarketer would then give the applicant an express mail or Federal Express number and tell the applicant to use the number to send All-Win its $199 application fee. Once All-Win received the fee, it forwarded the applicant's name,

along with a $25 fee, to North American Acceptance Exchange ("NAAE"). NAAE was not a real lender, but was a "denial mill." NAAE helped create the illusion that the loan process was legitimate by sending loan application papers to the applicants. The loan application was sent to the applicants to string them along and add to the illusion of legitimacy. Upon completing the application and mailing it to NAAE, or another denial mill used by All-Win, the applicant would ultimately receive a rejection letter.

In June of 1991, All-Win experienced "legal problems" and decided to relocate to Cherry Hill, New Jersey. Holz undertook the majority of the relocation effort. She rented space, obtained phone lines, and set up a new company under the name A-1. By July of 1991, the telemarketing scam was up and running again and continued to utilize the same procedures as All-Win, except that the application fee increased to $249. A-1 remained in business until November of 1991. By that time, A-1 and All-Win had

defrauded their "clients" of approximately $1.2 million.

B. The Defendant's Role in the Telemarketing Scam

The defendant, Daniel Duliga, joined the All-Win telemarketing scam in January of 1991, shortly after the company commenced operations. All-Win generally employed eight to ten telemarketers at any one time, and Duliga, like the other telemarketers, worked in a single, large room using a script provided by All-Win. A daily tally was kept of the application fees received, and all of the telemarketers, including Duliga, were aware that All-Win was not engaged in a legitimate business endeavor. The telemarketers often spoke freely of the fraudulent nature of their employment and joked about the gullible people from whom they received application fees. Duliga even admitted to a Postal Inspector that within the first week of his employment at All-Win he realized that All-Win was not processing any loans and that the individuals requesting the loans never received them.

Despite his awareness of All-Win's illegitimacy, Duliga developed into one of All-Win's top telemarketers and the company frequently called upon him to train newly

3

recruited telemarketers. For his efforts, he received both a salary and commissions. In addition, when All-Win decided to relocate to New Jersey in June of 1991, Holz and the other principals requested that Duliga join them in setting up the new business. Holz testified that she considered the talents of Duliga, as well as those of two other experienced telemarketers, crucial to a successful relocation. She even sought their opinions when determining where to relocate the business.

Duliga agreed to join the telemarketing operation in Cherry Hill, New Jersey and continued to work as a telemarketer for the newly established A-1 until November 1991. During his employment with the two companies, Duliga earned over $42,000 in salary and commissions and generated application fees in excess of $150,000.

C. Procedural History

On June 4, 1996, a federal grand jury sitting in New Jersey returned a twenty-six count indictment against Duliga and several other individuals. Count I charged Duliga and the others with conspiracy to commit mail and wire fraud, contrary to 18 U.S.C. SS 1341 and 1343, in violation of 18 U.S.C. S 371. Counts II through VI charged him and the others with mail fraud in violation of 18 U.S.C.

SS 1341 and 1342. Counts VII through XV charged him and the others with wire fraud in violation of 18 U.S.C. SS 1343 and 1342. Prior to trial, the United States Attorney dismissed several counts of the indictment and proceeded against Duliga only on counts I through VIII and counts XI through XV. The jury found Duliga guilty on all of these remaining counts.

On March 25, 1999, the court imposed sentence in accordance with the presentence report recommendation. Pursuant to U.S.S.G. S2F1.1(a), Duliga received a base offense level of six. Because the loss generated by the telemarketing scam was more than $800,000 but less than $1.5 million, Duliga received an eleven level increase in his base offense level pursuant to U.S.S.G. S 2F1.1(b)(1)(L). He also received an additional two level increase under U.S.S.G. S 2F1.1(b)(2) because the offense involved more

4

than minimal planning. Duliga's final offense level was 19 and his criminal history category was II, which resulted in an imprisonment range of 33 to 41 months. The district court sentenced him to 33 months' imprisonment, three years' supervised release, and a special assessment of $650.

II.

On appeal, Duliga contends that the district court incorrectly determined his base offense level by attributing to him the entire amount of loss generated by the conspiracy (approximately $1.2 million) rather than the amount of loss he generated through his own telemarketing efforts (approximately $155,000). "When reviewing the sentencing decisions of the district courts, `[w]e exercise plenary review over legal questions about the meaning of the sentencing guidelines, but apply the deferential clearly erroneous standard to factual determinations underlying their application.' " See United States v. Fuentes, 954 F.2d 151, 152-53 (3d Cir. 1992) (quoting United States v. Inigo, 925 F.2d 641, 658 (3d Cir. 1991)).

III.

Under U.S.S.G. S 2F1.1(a), a defendant convicted of a crime of fraud receives a base offense level of six. This offense level, however, is subject to increase depending on the amount of loss generated by the fraud. See U.S.S.G. S 2F1.1(b); see also United States v. Boatner, 99 F.3d 831, 835 (3d Cir. 1996). In calculating the amount of loss generated by the fraud, a sentencing court obviously may include amounts directly attributable to the fraudulent

conduct of the defendant. See U.S.S.G. S 1B1.3(a)(1)(A). In addition, where, as here, the crime of fraud for which the defendant has been convicted involves jointly undertaken criminal activity, the sentencing court may also attribute to the defendant amounts of loss resulting from the "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." See U.S.S.G. 1B1.3(a)(1)(B); see also Boatner, 99 F.3d at 835. However, to do so, the loss resulting from the acts or

omissions of others must be: (1) in furtherance of the jointly undertaken activity; (2) within the scope of the defendant's agreement; and (3) reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake. See United States v. Evans, 155 F.3d 245, 254 (3d Cir. 1998); United States v. Price, 13 F.3d 711, 732 (3d Cir. 1994); United States v. Collado, 975 F.2d 985, 995 (3d Cir. 1992).1

Applying this test, we believe that the district court correctly included the entire amount of the loss generated by the telemarketing scam when determining Duliga's offense level.2

First, all of the losses generated by All-Win and A-1 were in furtherance of the jointly undertaken activity. The goal of these two companies, and those who worked for them, was to produce as many fraudulent application fees as possible. All of the telemarketers used the same script to accomplish this goal, and all of the telemarketers were aware of the companies' fraudulent nature.

Second, all of the losses generated by All-Win and A-1 were within the scope of Duliga's agreement. He learned during his first week of work at All-Win that All-Win was

_____

1. As a preliminary matter, Duliga suggests that the Second Circuit's decision in United States v. Studley, 47 F.3d 569 (2d. Cir. 1995)(holding that the Guidelines require that a district court make a particularized finding as to the scope of the criminal activity agreed upon by a defendant and outlining the factors relevant to such a finding), should guide our disposition of this case. However, we think the resolution of this case is governed by this Court's decision in Collado and therefore adhere to the wisdom of that case.

2. We note that the district court did not necessarily undertake a searching and individualized inquiry before attributing the entire amount of loss generated by All-Win and A-1 to Duliga. See Collado, 975 F.2d at 995. However, because we are convinced that the attribution of that loss is firmly supported by the record, we see no reason to remand this case

only to have the district court reach the same sentencing decision. See id. at 997 ("The district court made no findings regarding the propriety of attributing to one brother sales made by the other, but after reviewing the transcripts of the telephone calls cited in the presentence investigation report, we are convinced that this instance of accomplice attribution was justified.").

6

not a legitimate venture, yet he continued to defraud individuals into believing that their application fees would materialize into loans. He also received a substantial salary from the companies, not just commissions based on his own application fees. Therefore, he possessed a stake in the success of the companies as a whole. Moreover, although Duliga characterizes himself as merely an employee that agreed to telemarket for the principals, the evidence plainly contradicts this characterization. Duliga was one of the top three telemarketers for the two companies, and when, the All-Win principals decided to relocate to New Jersey as A-1, they considered Duliga's assistance in the relocation crucial. Duliga clearly understood the illegal objectives of All-Win and A-1 and agreed to use his best efforts to further those objectives.

Third, all of the losses generated by All-Win and A-1 were reasonably foreseeable in connection with the criminal activity Duliga agreed to undertake. All of the telemarketers, including Duliga, worked side by side in one large room, and the telemarketers frequently joked about the naive applicants from whom they received application fees. Moreover, a daily tally was kept of the application fees received. Thus, far from being unforeseeable, the losses generated by All-Win and A-1 were within Duliga's plain view.

In sum, the evidence readily demonstrates that Duliga was a key player in the telemarketing scam from its inception to its conclusion and that the losses generated by that scam were reasonably foreseeable in connection with the scope of the criminal activity Duliga agreed to jointly undertake. He was more than aware of the scope of the operation and of its fraudulent character. Therefore, the district court committed no error in attributing them to Duliga.

IV.

Accordingly, the judgment of conviction and sentence of the district court will be affirmed.

7

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

8