

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-10-2004

# USA v. Rennert

Precedential or Non-Precedential: Precedential

Docket No. 03-1511

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation
"USA v. Rennert" (2004). *2004 Decisions.* Paper 561.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/561

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

_____

NO. 03-1511

_____

UNITED STATES OF AMERICA

v.

PHILIP ANDRE RENNERT,
Appellant

_____

NO. 03-1518

_____

UNITED STATES OF AMERICA

v.

GEORGE RAYMOND JENSEN,
Appellant

_____

NO. 03-1519

_____

UNITED STATES OF AMERICA

v.

MICHAEL LEWIS MILLER,
Appellant

_____

On Appeal from the United States
District Court for the
Eastern District of Pennsylvania

(D.C. Crim. No. 96-cr-00051)
District Judge: Hon. Clarence C.
Newcomer

_____

Argued December 5, 2003

Before: SLOVITER, ALITO, Circuit
Judges and OBERDORFER[*], District
Judge

(Filed: June 10, 2004)

_____

James H. Feldman, Jr.   (Argued)
Law Offices of Alan Ellis
Ardmore, PA 19003-2276

        Attorney for Appellant,
        Philip Andre Rennert

Peter Goldberger
Law Office of Peter Goldberger
Ardmore, PA 19003-2276

        Attorney for Appellant,
        George Raymond Jensen

Christopher D. Warren   (Argued)
Philadelphia, PA 19103

        Attorney for Appellant,
        Michael Lewis Miller

_____

[*]Hon. Louis F. Oberdorfer, United States
District Court for the District of
Columbia, sitting by designation.

Patrick L. Meehan
       United States Attorney
Laurie Magid
       Deputy United States Attorney
       for Policy and Appeals
Robert A. Zauzmer
       Assistant United States Attorney
       Senior Appellate Counsel
Andrea G. Foulkes(Argued)
       Assistant United States Attorney
Office of United States Attorney
Philadelphia, PA 19106


       Attorneys for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

**I.**

Appellants Michael Miller and Philip Rennert were convicted by a jury of conspiracy, wire fraud, and securities fraud; Appellant George Jensen was convicted by a jury of securities fraud. Their convictions resulted from their involvement in a complex scheme under which they leased the worthless stocks of several public companies to the Teale Network ("Teale"), a fraudulent network of offshore and domestic companies. The details of the operation of the Teale Network, through its principal Alan Teale, are set forth in our earlier opinion in United States v. Yeaman, 194 F.3d 442 (3d Cir. 1999), and we repeat only such details as are necessary to decide the issues before us in this appeal.

In essence, Teale represented the worthless leased stocks as valuable assets that could be liquidated to pay claims pursuant to reinsurance contracts entered into with World Life and Health Insurance Company ("World Life"), a Pennsylvania insurance company that was already in financial difficulty. When World Life attempted to liquidate these assets to pay its outstanding medical reinsurance claims, the stocks were found to be worthless.

World Life became insolvent at some point during or before 1988, but did not reveal its financial difficulty to regulators or to its insureds. In 1989 and 1990, World Life issued four group medical policies. Teale entered into contracts reinsuring World Life's policies from November 1989 to November 1990. Pursuant to these agreements, Teale assumed 100 percent of the liability associated with World Life's four group medical insurance policies in exchange for receipt of 92 percent of the premiums paid by World Life's insureds on those policies. Appellants supplied Teale with stocks from offshore companies that Teale could list as putatively valuable collateral backing the company, though the stocks were essentially worthless. Yeaman, 194 F.3d at 447.

In 1990, Rennert created Forum Rothmore to serve as an intermediary between Teale and the publicly traded corporations that desired to lease their stock to Teale. This arrangement created the appearance of legitimacy in two ways. First, Forum Rothmore helped the Teale Network comply with Pennsylvania

2

reinsurance regulations that require unlicensed offshore reinsurance companies, such as Teale, to deposit in escrow accounts collateral (in the form of corporate stocks) equal to the liability associated with its reinsurance contacts. Second, Forum Rothmore entered into "surplus contribution agreements" with Teale, which gave Teale the appearance of being backed by independent stockholdings. Id.

Teale and Rennert first met and discussed this fraudulent scheme in August 1990 and executed the first of their surplus contribution agreements on September 1, 1990. Under the terms of these agreements, public shell corporations leased their stock to Teale and authorized the sale of the stock, if necessary, to pay claims under insurance policies that Teale had reinsured. Teale then listed these shares at inflated values on the financial statements presented to World Life. After receiving insurance premiums from World Life, Teale paid monthly leasing fees to Forum Rothmore, which in turn split the fees with the stock providers. Id. The Teale Network was Forum Rothmore's sole client, and Forum Rothmore was the Teale Network's only consistent source of assets.

In particular, Forum Rothmore entered into surplus contribution agreements with Ecotech Corporation ("Ecotech"). Jensen was at various times in control of and president of Ecotech. On December 15, 1990, Jensen manipulated Ecotech's stock price and then leased one million dollars worth of Ecotech's stock to Teale. Although Ecotech's shares were virtually worthless, Appellants fraudulently over-valued Ecotech's shares on the company's financial statements. Members of the conspiracy manipulated the market for Ecotech and other corporations' stock in order to maintain the inflated trading prices.

Miller, a lawyer, was corporate counsel for Forum Rothmore and a shareholder in Ecotech. The Ecotech stock at issue was not tradeable and carried a restrictive legend to that effect. Miller issued opinion letters stating that Forum Rothmore could remove that legend from stock certificates so that it falsely appeared that the stock could be freely traded and leased to Teale. The Government submitted evidence that Miller was paid $130,208 for representing the company and $104,000 from leasing Ecotech stock to Teale.

In 1991, the Pennsylvania Insurance Department discovered World Life's insolvency and ordered its liquidation. Because Teale had been paying insurance claims with recently-received premiums and had no other significant assets to draw upon, this liquidation deprived Teale of the ability to pay further insurance claims. World Life's policyholders thus were unable to receive insurance payments as needed.

Following World Life's liquidation, the Pennsylvania Life and Health Insurance Guarantee Fund, a state fund through which Pennsylvania insurance companies pay the outstanding liabilities

3

of insolvent carriers, provided approximately $6.4 million for group medical reinsurance claims left unpaid as a result of the fraud.

## II.

Appellants were indicted on February 6, 1996 and were convicted by a jury on April 16, 1997. At the sentencing hearing held January 22, 1998, the District Court assigned each Appellant a one-point upward departure for loss of confidence in an important institution, but found no monetary loss attributable to the Appellants because World Life was insolvent at the time it entered into reinsurance contracts with Teale. The District Court also rejected the application of additional sentencing enhancements for use of special skills and substantially jeopardizing a financial institution.

Appellants appealed their individual verdicts and sentencing calculations to this court in 1998 and we set out the full factual and procedural history of their cases in prior unpublished opinions. See United States v. Rennert, Nos. 98-1145 & 98-1101, slip op. (3d Cir. Oct. 15, 1999); United States v. Jensen, Nos. 98-1148 & 98-1104, slip op. (3d Cir. Oct. 15, 1999); and United States v. Miller, Nos. 98-1147 & 98-1103, slip op. (3d Cir. Oct. 15, 1999). Appellants challenged the District Court's instructions to the jury, the sufficiency of the evidence supporting their convictions, and the upward adjustment for loss of confidence in an important institution. The Government cross-appealed, arguing that the District Court had erred in finding that there was no loss caused by the fraud, in failing to increase Miller's offense level because he had used special (legal) skills in furtherance of the conspiracy, and in failing to increase all Appellants' offense levels for causing a substantial effect on a financial institution.

In Miller, we rejected Miller's argument that he acted "only as an attorney." Instead, we held that Miller's involvement went "beyond the role of legal representation" and could not "be categorized as simple legal advice," especially given Miller's ownership of Ecotech stock and his letters regarding removal of restrictive legends. Miller, slip op. at 6. In Rennert and Jensen, we also upheld Rennert and Jensen's convictions and affirmed the imposition of a one-point upward departure based on loss of confidence to an important institution. However, we remanded all three cases for re-sentencing to consider 1) whether there was a causal connection between the Appellants' misrepresentations and the fraud loss caused by Teale's collection of premiums, and 2) in Miller's case, whether an enhancement would be appropriate for Miller's use of special (legal) skills. With respect to fraud loss, we clarified that the fraud loss calculation should be based on the dates of Appellants' agreement to the conspiracy, rather than the dates of their misrepresentations. Also, in a related case, we suggested that the loss calculation might be based on the net gain to Teale or the balance of unpaid claims. See Yeaman, 194 F.3d at 458-59 (involving

4

another co-defendant in the conspiracy who is not a party to the instant appeal).[1]

On February 3, 2003, the District Court held a re-sentencing hearing for Miller, Jensen, and Rennert. Miller attempted to present testimony and documents in support of his argument that the scope of his involvement in the conspiracy was less than that of his co-conspirators and that the extent of the total loss caused by the fraud was not foreseeable to him. In particular, Miller attempted to contest the Government's arguments that he was present at the August 1990 Teale-Rennert meeting, that he prepared opinion letters in support of the conspiracy, that he received payments for services as a stock provider, and that he falsified records bearing the date of Ecotech's merger with a gold mine to create additional stock shares for Teale. The District Court declined to permit Miller to submit additional evidence that was not already presented at trial because the issue was "subsumed" by the jury's verdict and was therefore immaterial to sentencing. See App. at 350-53 (finding Miller's factual allegations were "matters of defense for the trial, not for sentencing").

On the issue of fraud loss causation, the Government presented two witnesses,

a representative from the Liquidations and Rehabilitation Section of the Pennsylvania Department of Insurance and a general counsel to a third-party administrator. They stated that, had their organizations known that Appellants' assets were worthless, they would have halted the flow of premiums months earlier and forced World Life to obtain a solvent reinsurer.

On February 13, 2003, the District Court issued a sentencing opinion concluding that Miller, Rennert, and Jensen entered into an agreement conspiring to defraud World Life and its policyholders no later than August 30, 1990. The District Court held that the total fraud loss caused by the Appellants was approximately $3.2 million: the difference between the total premiums paid to Teale minus the claims paid by Teale to World Life's policyholders. The District Court further found that there was "a causal connection between the misrepresentations of the Defendants and the continued payment of premiums to World Life . . . and the Defendants." App. at 12-13. Finally, the District Court increased Miller's sentence based on his use of special skills and more than minimal planning. The Appellants also received upward departures for causing the loss of confidence in an important institution (the stock market). The District Court sentenced Miller to 51 months, Rennert to 63 months, and Jensen to 30 months of imprisonment.

All three Appellants contest the District Court's factual finding of a causal connection between their

---

[1] Yeaman again appealed to this court in United States v. Yeaman, 248 F.3d 223 (3d Cir. 2001), and we remanded for re-sentencing. He was re-sentenced on February 5, 2003 and did not appeal.

misrepresentations and the fraud loss to the victims of $3.2 million. Miller challenges the District Court's order barring him from submitting additional testimony and documents to demonstrate the "limited" scope of his involvement in the conspiracy. We will affirm.

## III.

The District Court had jurisdiction under 18 U.S.C. § 3231 and this court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We review the District Court's factual findings for clear error. United States v. Weaver, 267 F.3d 231, 235 (3d Cir. 2001). We review the District Court's decision to admit or deny evidence for abuse of discretion. United States v. Serafini, 233 F.3d 758, 768 n.14 (3d Cir. 2000).

### A.    Fraud Loss Causation

Appellants assert two primary challenges to the District Court's finding that their conspiracy caused approximately $3.2 million in fraud loss. First, all Appellants argue that the District Court erroneously found that their misrepresentations of stock values actually caused Teale to continue receiving premiums from World Life policyholders by preventing the Pennsylvania Department of Insurance from discovering the fraud and halting the flow of premiums. This is one of the issues we directed the District Court to consider on remand. Second, Rennert contends that even if the District Court were correct that the Pennsylvania Department of Insurance would have stopped the flow of insurance premiums to Teale Network if it had known Appellants were over-valuing stock, Rennert only should have been held liable for the approximately $1.3 million in losses that occurred on or after December 29, 1990, rather than counting losses beginning in September 1990. Because this lower fraud loss amount would have reduced Rennert's sentence, he argues that a remand for re-sentencing is required.

1.    Relationship Between Appellants' Misrepresentation of Stock Values and World Life's Continued Payment of Premiums

Appellants contend that the victim, World Life, did not rely on their misrepresentations of stock assets as valuable and therefore their misrepresentations did not cause the fraud loss. Moreover, they contend that it was World Life's own obstruction of the investigation by the Pennsylvania Department of Insurance – not their misrepresentations – that prevented the Department from discovering the fraud and immediately halting the flow of premiums to Teale. Appellants thus argue that the District Court committed clear error. The Government responds that World Life and its policyholders paid Teale millions of dollars for reinsurance in reliance on the Appellants' fraudulent representations that their stocks were valuable and redeemable as assets, as they purported.

We have addressed the issue of

6

fraud loss causation in connection with the Teale conspiracy in <u>Yeaman</u>, where we stated, "[w]ithout the assets of the defendants and the resulting appearance of solvency, the most reasonable inference is that World Life would have ceased paying premiums to Teale long before it eventually did." <u>Yeaman</u>, 194 F.3d at 458. We explained the causality analysis as follows:

> Teale could not have entered and remained in the business of reinsuring World Life but for its fraudulent misrepresentations. Although the District Court made no finding on the issue [before], the record would also appear to us to support the proposition that World Life was not capable of insuring any of the four group medical policies without having received a commitment for 100% reinsurance. It follows that if the Teale fraudulent reinsurance contracts had not been available, World Life would either have secured other reinsurance or would not have issued the group policies involved. If reinsurance from a solvent reinsurer had been obtained, all claims under the policies would have been paid to the reinsurer; if the group

policies had not been issued, the employers who purchased the policies from World Life would have obtained group medical coverage from another source and all claims of the beneficiaries would have been paid in full. In either event . . . there would have been a causal nexus between the fraud and all unpaid claims.

<u>Id.</u> at 459. In short, we found that the most reasonable inference is that World Life relied on the Appellants' misrepresentations about the value of their stock assets when it paid Teale additional premiums.

On remand, the District Court concluded that there was "a causal connection between the misrepresentations of the Defendants and the continued payment of premiums to World Life, and . . . Teale and the Defendants." App. at 12, 34. In particular, the District Court made the following findings:

> -Had the true value of the Defendants' stocks been known, at the very least, the Pennsylvania Department of Insurance would have stopped the payment of premiums to the Teale Network.

> -In addition, because World

Life was insolvent, had the reinsurance contracts been terminated, the company would have been liquidated much sooner than it was, and the policyholders would have never made those premium payments at all.

App. at 13, 35.

Although Appellants argue that the District Court's findings do not answer the question of whether their misrepresentations caused the fraud loss, it is apparent that the Department of Insurance did not intercede because it did not know "the true value of the [Appellants'] stocks." App. at 13. That lack of knowledge was the result of Appellants' misrepresentations of the value of those stocks. This, in turn, caused the Department of Insurance to permit World Life's continued operation and caused World Life to continue providing Teale insurance premiums in reliance on Appellants' misrepresentations. Appellants' attempt to sever the connection between their misrepresentations and the Department of Insurance's delayed intervention is unpersuasive.[2]

Appellants next challenge the sufficiency of the evidence supporting the District Court's finding that the flow of insurance premiums would have been halted but for their misrepresentations. At the Appellants' re-sentencing hearing, two Government witnesses testified that but for Appellants' misrepresentations about the value of the stock assets Teale claimed as collateral, World Life would not have continued paying its policyholders' premiums to Teale – that is, the Department of Insurance or various policyholders would have halted the flow of premiums if they had known the true value of Appellants' stocks. One witness, the Director of Liquidations and Rehabilitation for the Pennsylvania Department of Insurance, testified that the Department could have halted the flow of insurance payments had it known that Appellants' assets were worthless.[3]

___

[2] Appellants suggest that Teale's insolvency would not have provided World Life with automatic grounds to terminate its relationship with Teale

because their reinsurance contract did not provide for termination based on Teale's insolvency. We do not accept this argument. If Teale were insolvent, it no longer could meet its contractual obligations to provide reinsurance to World Life. Because Appellants have identified no contract provision requiring World Life to continue providing premiums after Teale has materially breached their contract, we have no reason to assume that World Life would be bound to continue honoring a contract that Teale had breached.

[3] Appellants emphasize that the Insurance Director stated that the

8

Because Appellants fraudulently misrepresented their assets' value and made it appear that Teale was solvent, however, the Department was not authorized to intervene.[4]

Similarly, the general counsel to a third-party insurance administrator

_____

Department "could . . . have acted months sooner . . . to stop the flow of premiums," App. at 386-87, but did not state that it <u>would</u> have done so. The District Court did not clearly err in concluding that the Department would have acted if it had known the true value of the assets Appellants misrepresented, given its later investigation and liquidation of World Life. We also reject Appellants' argument that the Department could not have stopped World Life from continuing to provide Teale with premiums "months sooner" based on administrative hurdles to the investigatory and liquidation processes. The District Court did not err in crediting the Director's statement that it could have mobilized its administration to act quickly.

[4] Appellants suggest that the Department of Insurance did not begin investigating World Life until January 1991 and therefore Appellants' misrepresentations had no effect prior to that date. This argument assumes that the Department would not have begun investigating World Life if it were known that its reinsurer, Teale, lacked collateral assets as of 1990. This argument is without support and is directly contrary to the Director's testimony.

testified that he recommended that World Life partner with Teale based, in part, on Appellants' misrepresentations of the value of their assets based on the manipulated market prices. The general counsel analyzed the Appellants' fraudulent market valuations of their assets and inferred that the Teale Network was a legitimate, solvent business based on those representations. He further testified that if he had known that the stocks backing Teale were worthless, he would have removed his company's group policies and reinvested them with a solvent carrier.

We come then to Appellants' argument that it was World Life's failure to cooperate with the Pennsylvania Department of Insurance – not Appellants' misrepresentations – that delayed the discovery of Teale's fraud. But the fraud victim's negligence or lack of diligence in uncovering the fraud is not a defense. <u>United States v. Coyle</u>, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct.") (citations omitted); <u>see</u> <u>also</u> <u>United States v. Bennett</u>, 9 F.Supp. 2d 513, 523 (E.D. Pa. 1998) ("Taking advantage of a victim's self-interest does not mitigate the seriousness of fraudulent conduct.") (quotations and citations omitted). Nor do the Appellants cite any case law suggesting that courts may not find fraud loss causation where the victim has not immediately assisted the authorities in investigating the fraud.

In addition, the Government properly notes that even assuming that

9

World Life could be held to be contributorily negligent, such an argument ignores our prior finding that the fraud victims also included World Life policyholders, who could not be reimbursed for their medical costs until the Commonwealth's bail-out. Yeaman, 194 F.3d at 458. Nothing in the record suggests that the policyholders acted negligently or that they should have been expected to be suspicious of the true value of its reinsurance agent's assets.

In light of the evidence from the trial as well as the re-sentencing hearing, the District Court did not clearly err in finding a causal connection between the Appellants' misrepresentations and the losses incurred by World Life and its policyholders.

### 2. Rennert's Sentence and the Beginning Date of the Fraud

Rennert also argues that the District Court should have calculated the fraud loss for the period after December 1990 because the Department of Insurance Director stated that had it known of the true value of Appellants' stocks in December 1990, it would have halted the flow of premiums. Rennert did not assert this alternative loss calculation during the District Court's sentencing hearing and, thus, has waived the argument. See United States v. Bethancourt, 65 F.3d 1074, 1082 (3d Cir. 1995).

### B. Miller's Claim Regarding the Scope of His Involvement

### 1. Relevant Conduct

In his separate appeal, Miller asserts that the District Court erroneously conflated the jury's "general" conspiracy conviction with the court's conclusion that Miller should be held liable for all losses related to the conspiracy under the relevant conduct provision of the United States Sentencing Guidelines, U.S.S.G. § 1B1.3. Miller contends that even if a defendant has been convicted of a conspiracy charge, the trial court must make particularized findings as to the scope of each conspirator's involvement in order to increase the conspirator's sentence under Section 1B1.3.

Under the Sentencing Guidelines, a defendant's offense level is subject to increase depending on the amount of loss caused by the fraud. Section 1B1.3(a) provides that the district court should adjust the specific offense level by taking into account all conduct relevant to the offense. U.S.S.G. § 1B1.3(a). This includes "all reasonably foreseeable acts and omissions of others in furtherance of [a] jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

Miller asserts that United States v. Collado, 975 F.2d 985 (3d Cir. 1992), requires that we remand this case in light of the District Court's lack of findings as to the precise scope and timing of his agreement to join the conspiracy.[5] In

_____

[5] Miller also cites United States v. Studley, 47 F.3d 569 (2d Cir. 1995). However, Studley is not a binding precedent on this court and we have made

Collado, we stated that the district court must consider whether the loss resulting from the actions of co-conspirators was 1) "in furtherance of the . . . jointly-undertaken . . . activity," 2) within "the scope of the defendant's agreements," and 3) "reasonably foreseeable in connection with the criminal activity the defendant agreed to undertake." 975 F.3d at 995 (citing U.S.S.G. § 1B1.3, application note 1); see also United States v. Duliga, 204 F.3d 97, 100 (3d Cir. 2000). We held that the relevant conduct provision depends upon each defendant's role in the conspiracy and stated that courts must conduct "a searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy" in order to "ensure that the defendant's sentence accurately reflects his or her role" in the conspiracy. Collado, 975 F.3d at 995. We added that district courts also should consider other factors, such as whether the defendant profited or assisted others in the conspiracy. Id. at 991-94. We further clarified that a conspiracy conviction does not obviate the need for analysis under the relevant conduct provision. Id. at 993, 997.

Collado dealt with the liability of two brothers involved in a larger drug conspiracy. The district court had not made any factual findings as to the scope

---

clear that the resolution of such issues is governed by this Court's decision in Collado. United States v. Duliga, 204 F.3d 97, 101 n.1 (3d Cir. 2000). Accordingly, our analysis focuses on Collado.

of the brothers' involvement in the conspiracy or in each other's transactions, but instead only adopted the findings of the presentence report in attributing to each of them the drug quantity from the conspiracy. Although we required individualized inquiry, we did not impose an immutable requirement that the district court hold extensive hearings to make explicit, particularized findings as to the exact date on which each defendant committed to the conspiracy or the precise contours of each conspirator's agreement. We instead employed a more flexible approach. We remanded the case to the district court to determine when the defendants had joined the larger conspiracy because the district court had made no finding on the issue and the record was not clear on this issue.

Critically, however, we also affirmed the district court's attribution to one brother the amounts the other brother supplied to the conspiracy. We affirmed this finding based on our review of the record, despite the district court's lack of explicit findings on this issue. Because the record was clear on its face, the district court's lack of particularized findings was not dispositive. We instead concluded that the district court's accomplice attribution conclusion between the brothers was supported by the record evidence of their awareness of and assistance to each other in drug transactions. See id. at 997.

More recently, in Duliga, we reaffirmed the proposition that even absent explicit findings on the precise scope of a defendant's involvement, a district court's

11

decision may be affirmed if it is adequately supported by the trial court record. 204 F.3d at 101 n.2. Although the district court in that case "did not necessarily undertake a searching and individualized inquiry before attributing the entire amount of [fraud] loss . . . to Duliga," we affirmed without remanding because we were convinced that the attribution of the fraud loss was "firmly supported by the record." Id.

Here, the record evidence suffices to support the conclusion that Miller had agreed to the conspiracy by at least August 1990 and should be held liable for the full amount of loss caused by the conspiracy. In contrast to Collado's under-developed record, the record in this case included Miller's opinion letters on fraudulent stock transactions, his demand letters to protect artificially inflated stock quotes, and his letters advising the removal of restrictive stock certificate legends so that non-marketable shares would appear to be tradeable. Miller played a critical role, enabling the conspiracy to function and providing it an imprimatur of legitimacy. The record evidence of Miller's extensive involvement in the conspiracy supports the District Court's application of the relevant conduct provision.[6] As with Duliga, "we

see no reason to remand the case only to have the district court reach the same sentencing decision." 204 F.3d at 101 n.2.

2.     Evidentiary Issues

Miller also contends that the District Court abused its discretion by denying his request to submit additional evidence that allegedly would have had a direct bearing on the scope and timing of his involvement in the conspiracy and his inability to foresee the total fraud loss caused by the conspiracy. In particular, Miller attempted to submit evidence to dispute 1) his presence at the first meeting between Rennert and Teale in August 1990 (the time at which the Government suggested that Miller joined the conspiracy); 2) Forum Rothmore's designation of payments to Miller as legal fees or leasing fees in its financial records; and 3) the timing of Miller's first discussion with the owners of the gold mine corporation (with which Ecotech merged) about receiving Ecotech stock in order to bolster Ecotech's financial statements. Because the District Court found that the issue of foreseeability was subsumed in the jury verdict, it stated that it would not permit Miller to re-try an issue that the jury had already determined. We consider each piece of Miller's evidence below.

Even assuming Miller was *not* present at Rennert and Teale's August 1990 meeting, several of Miller's other actions evidence his involvement in the conspiracy by August 1990. For example, in June 1990, two months before the

---

[6]     Because we rely on the record evidence of Miller's agreement and complicity, we need not reach Miller's claim that the District Court may have improperly conflated the jury's conspiracy verdict with a finding of full liability under the relevant conduct provision.

Rennert-Teale meeting, Miller provided Rennert with an opinion letter to support Forum Rothmore's practice of leasing worthless assets. On July 13, 1990, Miller authored an opinion letter recommending the re-issue of the restricted Ecotech stock held by Jensen, Rennert, and Miller without a restrictive legend. This made it appear that Forum Rothmore could provide Teale with millions of marketable shares. In an August 28, 1990 letter, one week after the Rennert-Teale meeting, Miller wrote to Teale expressing his interest and commitment to what he termed the "credit enhancement program" that forms the basis of the fraud charges against the defendants, along with a $25 million offer of stocks from Ecotech and other corporations. Supp. App. at 638-47. Regardless of whether he was present at the Rennert-Teale meeting, the remainder of Miller's actions strongly support the District Court's conclusion that he had joined the conspiracy by or before August 1990.

Miller responds that he undertook the aforementioned actions "in good faith." Miller Reply Br. at 8-9. Yet, the cumulative effect of Miller's aforementioned actions (the June opinion letter, the July letter recommending re-issue of stock, and the August letter to Teale) suggests that Miller was too central to the operation to believe naïvely that he and his associates were all within the bounds of the law. Based on the record evidence, Miller's explanation is not credible and the District Court did not abuse its discretion in rejecting Miller's attempt to submit evidence regarding his presence at the Rennert-Teale meeting.

Miller also attempted to submit evidence from his personal records and journals that he contended showed that he was not paid to provide stock to Forum Rothmore with knowledge of his co-defendants' fraudulent activities, but only received legal fees and a loan. Miller emphasizes that Forum Rothmore's faulty accounting system improperly denominated his payments as stock provider fees, rather than traditional payments for legal fees.

As the Government points out, the designation of Forum Rothmore's payments as "leasing fees" or "legal fees" is inconsequential because the payment was made in exchange for Miller's services in advancing a fraudulent scheme. Because Miller does not contest the District Court's finding that he used his legal skills in furtherance of the fraud, the fact of payment for fraudulent services is the critical point while the form of his payment is irrelevant. Moreover, as we noted in <u>Miller</u>, Miller's services could not "be categorized as simple legal advice." <u>Miller</u>, slip op. at 7.

Although Miller responds that he was acting in good faith when he rendered the legal services for which he received remuneration and was not aware that his legal services were being misused for a criminal conspiracy, the record does not support his contention. We also note that Miller's argument that Forum Rothmore only paid him for good-faith legal services,

13

rather than fraudulent stock-leasing activities, goes to whether or not he acted in furtherance of the conspiracy. The jury's verdict shows that it decided that issue adversely to Miller. Despite Miller's insistence that his new evidence only pertained to the timing or scope of his commitment, Miller also attempted to argue that he was entitled to submit evidence to attempt to nullify the jury's conspiracy connection, especially in his earlier pleadings. We emphasize that Collado does not entitle a defendant to re-litigate his or her guilt or innocence and thus, the issue of whether he was paid to fraudulently provide stock is not the subject of a Collado analysis.

Lastly, Miller attempted to submit evidence to counter the Government's allegation that he falsified records to deceive his accountant and regulatory authorities regarding the value and marketability of Ecotech's assets. In particular, Miller states that in September and October of 1991 or earlier, he discussed providing restricted, non-marketable Ecotech stock to the gold mine corporation with which Ecotech merged. As such, Miller suggests that he should only be accountable for losses incurred after fall 1991, but not before.

Even if Miller did not falsify records until late 1991, there were still enough other indicia of his involvement in 1990, discussed above, to support the conclusion that he already had committed to the conspiracy in 1990, regardless of whether he committed additional frauds in connection with Ecotech's merger with the gold mine corporation. In sum, even assuming that Miller would have been permitted to submit his proffered evidence, Miller's evidence would not have been sufficient to undermine the basis in the record for imposing accomplice liability. We hold the District Court did not abuse its discretion in denying Miller's proffer of the evidence.

## IV.

We will affirm the judgment of the District Court for the reasons set forth.