**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 12-4358/12-4374/12-4613/13-1289/13-1664

UNITED STATES OF AMERICA

v.

WILLIAM FRISBY, a/k/a Gate, a/k/a Bill

WILLIAM FRISBY,

Appellant in case no. 12-4358.

UNITED STATES OF AMERICA

v.

KWANE GLOVER,

Appellant in case no. 12-4374.

UNITED STATES OF AMERICA

v.

TERRANCE WADE, a/k/a Turk

TERRANCE WADE,

Appellant in case no. 12-4613.

UNITED STATES OF AMERICA

v.

MALANI SANDERS, a/k/a DOG

MALANI SANDERS,

Appellant in case no. 13-1289.


UNITED STATES OF AMERICA

v.

JAMAL STEWART, a/k/a Mali, a/k/a Mal

JAMAL STEWART,

Appellant in case no. 13-1664.

---

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(District Court Nos. 2-11-cr-00564-005; 2-11-cr-00564-010;
2-11-cr-00564-012; 2-11-cr-00564-013; 2-11-cr-00564-004)
District Judge:  Honorable Harvey Bartle, III

---

Submitted under Third Circuit LAR 34.1(a)
July 7, 2014


Before:  RENDELL, CHAGARES and JORDAN, Circuit Judges

(Opinion filed: July 17, 2014)

---

## O P I N I O N

**RENDELL**, <u>Circuit Judge</u>:

Co-defendants William Frisby, Kwane Glover, Terrance Wade, Malani Sanders and Jamal Stewart all contend that the evidence at trial was insufficient to support their convictions for conspiracy to distribute drugs. Frisby and Glover also challenge their sentences, arguing that the District Court failed to make individualized findings regarding the quantity of drugs for which each was responsible. Finally, Wade urges that, at trial, certain Government evidence of association between the co-defendants was unduly prejudicial and should have been excluded. For the reasons set forth below, we will reject defendants' arguments and affirm their convictions, as well as the District Court's judgments of sentence.

## I. **Background**

Because we write for the benefit of the parties, we recount only those facts necessary for our disposition of the case. Certain facts specific to each co-defendant are recounted below, but the Government also advanced significant evidence common to the entire charged conspiracy. Namely, in 2009, the FBI started investigating a suspected drug trafficking organization in the Courtyard Apartments in Philadelphia. They utilized informants, controlled purchases of drugs, pen registers, search warrants, and wiretaps of co-conspirator and Government witness Mayoshi Sanders.

The evidence showed that in March 2011, Sanders transitioned from a street-level dealer to a mid-level supplier of narcotics. Of note, Frisby, Glover, Stewart, and Malani

Sanders had known Mayoshi Sanders for many years, while Wade only met him in 2008. In March 2011, Mayoshi became a repeat supplier of crack cocaine or powder cocaine for each of the co-defendants. Specifically, in the months between March and May 2011, Sanders converted approximately 632 grams of cocaine into crack cocaine and sold it to co-defendants and other members of the alleged conspiracy, for resale in the Courtyard Apartments.

Emblematic of a classic hub-and-spokes conspiracy, all of the co-defendants purchased crack cocaine or powder cocaine from Sanders and resold the drugs in the Courtyard Apartments area. They arranged purchases with Sanders through brief phone conversations which often lacked any identifying names, discussion of price or method of delivery. The Government introduced the telephone toll records of the co-defendants for the two-month period in March to May of 2011, which showed the co-defendants were in frequent contact with one another during that time. It also presented eyewitness testimony and photographs, showing the co-defendants selling drugs in close proximity and otherwise associating in the Courtyard Apartments within the time frame of the charged conspiracy. Further, street-level drug purchasers from the Courtyard Apartments testified that the co-defendants often sold drugs to the same set of customers, and always without infighting.

At trial, multiple witnesses testified that outsiders could not sell narcotics in the Courtyard Apartments area. Two drug suppliers, Tiyeak Cook and Alfred Jenkins, confirmed that without family or other connections to the area, a prospective drug seller

4

could not set up shop in the Courtyard Apartments. (App. 851, 914.)[1] Further, Sanders himself agreed that a family or historical connection, common to all co-defendants, was necessary "to be able to sell drugs there." (App. 132.) Sanders felt so safe in the area, in fact, that he refrained from carrying a firearm around the Courtyard Apartments. (App. 317.)

The Government also introduced evidence specific to the individual co-defendants, which we will address in turn.

## II.    Sufficiency of the Evidence

The standard of review for a sufficiency challenge is extremely high. "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979). "The district court—and we—are not to act as a thirteenth juror. Instead, the jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not 'fall below the threshold of bare rationality.'" *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) (quoting *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) (per curiam)).

All of the defendants were convicted of conspiracy to distribute narcotics, a crime which requires (1) a unity of purpose between the alleged conspirators, (2) an intent to

---

[1] For ease of reference, we utilize the Government's Supplemental Appendix to refer to the record.

achieve a common illegal goal, and (3) an agreement to work together toward that goal. *Id.* at 425. Each of the defendants contends that he was merely in a buyer-seller relationship with Mayoshi Sanders and/or other members of the alleged conspiracy. In essence, the defendants argue that there was no evidence they had actually agreed to work together in furtherance of an illicit objective.

"It is well-settled that a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999). However, "even an occasional supplier (and by implication an occasional buyer for redistribution) can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." *Id.* at 198. In *Gibbs* we noted that certain circumstances may be especially probative of a conspiracy, such as "the length of affiliation between the defendant and the conspiracy; whether there is an established method of payment; the extent to which transactions are standardized; and whether there is a demonstrated level of mutual trust." *Id*. at 199.

By contrast, in *United States v. Pressler*, 256 F.3d 144, 153 (3d Cir. 2001), we held, *inter alia*, that simply referring a drug customer to a supplier, or vice-versa, was insufficient to support a conspiracy conviction. We further recognized that living with another drug dealer and occasionally sharing a common source of supply lacked the hallmarks of conspiracy. *Id*. at 154-55. However, then-Chief Judge Becker also noted that offering protection, serving as a lookout, providing drugs on credit, and conducting

6

business in code all supported a finding of conspiracy, rather than a buyer-seller relationship. *Id.* He took pains to note that conspiracy convictions are not reviewed pursuant to set, dispositive factors, but upon the particular facts and circumstances of the case. *Id.* at 147.

Turning to the individual defendants here, we find ample evidence that they entered into an agreement to work together to distribute drugs. First, William Frisby bought various types of drugs from Sanders on multiple occasions and resold the drugs in the Courtyard Apartments area. Frisby purchased the drugs through phone calls with Sanders, which were intercepted and played for the jury. The lack of any discussion of price or method of payment on these calls permits an inference, at the very least, that Frisby and Sanders shared a degree of mutual trust indicative of a conspiracy. Further, in other intercepted calls played for the jury, Frisby warned Sanders about police presence on three different occasions. Sanders testified as to the first call, "[b]ecause I'm normally having drugs on me [Frisby was] basically just warning me to let me know that they [police] down there, don't come down there." (App. 126.) Sanders also testified that he would do the same for Frisby, to "look[] out for him." (*Id.*)

In warning Sanders on multiple occasions, Frisby acted as a lookout for his supplier. "When one person serves as a lookout during another person's drug deals, it suggests a unity of purpose and an intent to achieve a common goal (to sell drugs without being caught) and an agreement to work together toward that goal (because one does not serve as a lookout without agreeing to do so)." *Pressler*, 256 F.3d at 155. In *Pressler* we found that serving as a lookout "alone" may be enough to establish a conspiracy. *Id.*

7

Here, the evidence of Frisby's repeated warnings to Sanders, in combination with his multiple drug purchases and the other evidence set forth above, certainly permits a rational finding that Frisby conspired with Sanders and the other defendants to distribute drugs.

The same analysis applies to Kwane Glover, who warned Sanders of police activity on two occasions, also in telephone calls played for the jury. As Sanders testified, Glover "was just looking out for me. Don't want me to get locked up." (App. 165.) Glover stated in one such call, "I need you man," indicating his desire to have Sanders continue to supply him with drugs. (App. 165.) Glover also purchased drugs from Sanders frequently, reselling them in the common Courtyard Apartments zone. In addition, through a series of intercepted text messages and phone calls, Glover loaned Sanders his scale to use in weighing narcotics. (App. 193-96.) On this issue, *Pressler* took note of our prior decision in *United States v. Powell*, 113 F.3d 464 (3d Cir. 1997), finding "the fact that the Powell brothers shared packaging materials demonstrated that they had integrated their activities, which implied the presence of an underlying agreement." 256 F.3d at 155. Accordingly, Glover's sharing of the narcotics scale and his warnings to Sanders, combined with the other evidence noted above, together establish that a jury could rationally find Glover guilty of conspiracy.

Next, Jamal Stewart, Frisby's brother, bought powder cocaine from Sanders every three to four days for "a couple of months." (App. 130-31, 139-41.) Stewart would then cook the powder cocaine into crack for resale in the Courtyard Apartments. (App. 131.) Like the other defendants, Stewart arranged his purchases with Sanders over the phone,

8

in conversations played for the jury. Sanders himself noted that they never made reference to any price because, in his testimony, "we did this over and over, plenty of times . . . ." (App. 206.) After Frisby was initially arrested, Stewart spoke to Sanders on an intercepted call and laughed about the fact that he had evaded the police. (App. 303-04.) In another call, Stewart and Sanders discussed a plan to rob one of Stewart's heroin customers, though the plan was never put into action. (App. 288-90.)

In addition, Sanders testified that he and Stewart had a "bond," such that they would share information as to other drug suppliers, and if Stewart knew of a "source that I could get something from, then he would let me know and . . . he'd call me and I'd get with him." (App. 136.) Indeed, Stewart and Sanders both shared common suppliers, and on one occasion Stewart drove with Sanders to another drug dealer, whereupon Stewart purchased cocaine for both of them and gave Sanders his portion. (App. 237-39.) Under such facts, taken together with toll records showing that Stewart made 77 calls to Sanders and 136 to Frisby in only a two-month period, the jury could rationally decide that Stewart was more than an arms-length buyer or seller, and rather conspired with Sanders and the co-defendants to work together to distribute drugs.

Similarly, Terrance Wade repeatedly purchased crack cocaine from Sanders and resold it in the Courtyard Apartments area. Like the other defendants, Wade arranged his purchases from Sanders through brief phone calls in which the parties never identified themselves. Wade was among a few people, mostly the alleged co-conspirators, who were allowed inside the house of Elizabeth Cadogan, which Sanders testified to have previously used for packaging drugs. (App. 259-60.) Specifically, Sanders listed

himself, Stewart, Frisby, Malani Sanders, and Wade as the people that were permitted to go in the house.  (App. 259.)  Toll records shown at trial also established that Wade was in regular communication with other members of the conspiracy, including Sanders, Frisby, and Stewart, from March to May 2011.  (App. 1648.)   Further, Betty Ann McKinney testified that Sanders directed her to purchase crack cocaine from Wade approximately once every two months, generally for her own use.  (App. 728-33.)  Under *Pressler*, the repeated referral of a drug customer, standing alone, may not itself permit an inference of an illegal agreement.  256 F.3d at 155.  However, taking such evidence together with Wade's drug sales in a common, protected area, his access to a house used for drug packaging open only to others in the conspiracy, his toll records, and his repeated, familiar drug purchases from Sanders, along with the common evidence above, a jury could rationally conclude that Wade had agreed to join the conspiracy and act in furtherance of its objectives.

Finally, Malani Sanders, the older brother of Mayoshi Sanders, sold crack cocaine in the Courtyard Apartments and purchased drugs from Mayoshi.  In 2009, Mayoshi "either fronted or gave [free of charge]" a quarter-ounce of cocaine to Malani when he was released from prison, in Mayoshi's words, "just so [Malani] could get on his feet when he came home."  (App. 97, 156.)  Fronting, or providing drugs on credit, even once or twice, "is sufficient evidence of a conspiracy."  *United States v. Iglesias*, 535 F.3d 150 (3d Cir. 2008).  In addition, on one occasion, Malani called Mayoshi to arrange for a delivery of a quarter-ounce of cocaine to Brittany Goring, Malani's wife.  Further, Mayoshi testified that he "gave [Malani] the same customers [he] had," so that Malani

10

"could make some money." (App. 98.)  Given this evidence, along with that noted earlier, a jury could reasonably find that Malani Sanders agreed to work with the other members of the conspiracy to distribute drugs.

In sum, we cannot conclude that the jury's verdict as to any of the defendants fell below the standard of "bare rationality." *Caraballo-Rodriguez*, 726 F.3d at 431.  We are mindful that it is not our place to reweigh the evidence or reverse the jury's conclusion "simply because another inference is possible—or even equally plausible . . . ." *Id.* There was sufficient evidence of criminal conspiracy as to each of the defendants for the jury to convict, and as a consequence, we must uphold those convictions.

## III.    Evidence of Association

Wade alone contends that certain Government evidence of association between the defendants was unduly prejudicial and should have been excluded under Fed. R. Evid. 403. "The [challenged] evidence presented consisted of innocuous sightings by police of the various defendants, several photos from a pole camera of [Wade] and his co-defendants standing in the Courtyard Apartments, and phone records showing contact between the defendants." (Wade Br. at 24.)  The District Court reasoned that the probative value of the evidence outweighed any prejudice urged by Wade.  A court ruling pursuant to Rule 403 is reviewed for abuse of discretion, and may be reversed only if "arbitrary or irrational." *United States v. Lee*, 612 F.3d 170, 184-85 (3d Cir. 2010).

Wade first notes eyewitness testimony and photographs placing him alongside the other defendants in the Courtyard Apartments. Wade contends that such testimony allowed a prejudicial inference, that merely associating with each other was evidence of

11

criminality. Second, Wade argues that admitting the toll records of calls between the defendants was similarly prejudicial, as there was no evidence that those calls were about illegal activity. Both arguments must be rejected.

As the Government points out, in order to prove a conspiracy it is often necessary to establish that the alleged conspirators actually knew and associated with each other. *See United States v. McGlory*, 968 F.2d 309, 333 (3d Cir. 1992) (noting that evidence of a slip of paper with a coconspirator's name and phone number was admissible as circumstantial evidence of the defendant's association with a co-conspirator). Here, the evidence of association was used to bolster the other evidence against Wade, including his use of a common supplier, the referral of a drug customer, and selling in a protected area.

Further, in order for evidence to be considered unfairly prejudicial it must have "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Cross*, 308 F.3d 308, 324 n.23 (3d Cir. 2002) (quoting Fed. R. Evid. 403 advisory committee note). Unlike a prior criminal record or a propensity to lie, the fact that a defendant associated with another, both in person and via phone calls, generally would not itself cause a jury to convict on an improper basis, let alone an emotional one. We accordingly affirm the District Court's evidentiary rulings.

## IV. **Drug Quantity**

Frisby and Glover both contend that the District Court erred under the guidelines in attributing 279 grams of crack cocaine to them in the absence of explicit factual

12

findings. Application of guidelines to the facts is reviewed for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). Under U.S.S.G. § 1B1.3(a)(1)(B), the criminal offense level for a co-conspirator is determined by reference to "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . ." For a drug conspiracy, the court must determine the quantity of drugs attributable to each conspirator based on this standard. "Accomplice attribution often results in a dramatic increase in the amount of drugs for which the defendant is held accountable, which translates directly into a dramatic increase in the sentence." *United States v. Collado*, 975 F.2d 985, 995 (3d Cir. 1992). Thus, "it is not enough to merely determine that the defendant's criminal activity was substantial. Rather, a searching and individualized inquiry into the circumstances surrounding each defendant's involvement in the conspiracy is critical to ensure that the defendant's sentence accurately reflects his or her role." *Id.*

However, even where a district court does not make specific factual findings concerning a given drug quantity, the final quantity determination will be upheld if it is supported by the record. *See United States v. Duliga*, 204 F.3d 97, 101 n.2 (3d Cir. 2000); *see also United States v. Rennert*, 374 F.3d 206, 215 (3d Cir. 2004) ("[W]e [do] not impose an immutable requirement that the district court hold extensive hearings to make explicit, particularized findings as to the exact date on which each defendant committed to the conspiracy or the precise contours of each conspirator's agreement.") (*vacated in part on other grounds*).

Frisby and Glover essentially raise two arguments. First, they contend that the District Court failed to make a proper inquiry as to the amount of drugs attributable to each defendant. Second, they argue that other co-defendants were provided with a more searching and individualized inquiry regarding drug quantity, and they urge that their sentences should be overturned on this basis as well. As for the latter argument, simply because the District Court may have utilized different methods to determine the co-conspirators' sentences here, that does not automatically render a relatively longer or shorter inquiry an abuse of discretion. We thus reject the contention that Frisby and Glover should be resentenced on that ground. We address the first argument, with respect to both defendants, in turn.

1. William Frisby

The District Court heard in-depth argument from the parties as to the drugs attributable to Frisby. In sum, the Government argued that some 633 grams of crack cocaine were dispersed in furtherance of the conspiracy in just the two months of March to May 2011, and so Frisby, as a member of the conspiracy, could reasonably foresee that amount of drugs as distributed in furtherance of that criminal scheme throughout its entire duration. Frisby argued below that when arrested, he possessed only six grams of crack cocaine, and that the jury only found him guilty of conspiracy with intent to distribute between 28 and 279 grams. At sentencing, he argued for a sentence at the lower end of that spectrum.

The District Court found 279 grams of crack cocaine, the high end of the jury verdict, attributable to Frisby as a co-conspirator, thus rejecting both the Government's and Frisby's recommendations.

Under our precedent, this finding as to Frisby's responsibility reflects a sufficiently individualized inquiry. Also, by attributing to Frisby an amount of drugs that was reasonably foreseeable to him and that was distributed in furtherance of the conspiracy, while adhering to the range set by the jury, the District Court did not abuse its discretion. Frisby's sentence is accordingly affirmed.

2. Kwane Glover

The Court also heard a thorough discussion of Glover's responsibility at sentencing. The Government argued that Glover was responsible for 1.2 kilograms of crack cocaine. In doing so, the Government relied on numbers derived from Sanders's testimony at trial and Glover's statements made in a "safety-valve session." (Gov. Br. at 57-58.) The Government argued that Glover sold approximately 10.5 grams per week for 14 months, totaling 558 grams. Further, it was undisputed that Sanders distributed some 633 grams from March to May 2011 to the members of the conspiracy.

Glover urged a more lenient approach. First, he argued that the Court was constrained to the jury verdict of 28 to 279 grams of crack cocaine. Second, Glover claimed that he only distributed two packets of crack cocaine a week for about three months, totaling 112 grams. He further claimed that he sold primarily from inside a house and was therefore not involved in the street-selling that was the focus of much of the rest of the conspiracy, and so could not foresee the crack cocaine that was distributed

15

generally by Sanders. Glover also argued, and reiterates now, that he conceded responsibility for about 112 grams in a "safety-valve" session with the Government, and that the Government did not contest any of the statements made in that session.

As with Frisby, the Court rejected both parties' arguments and found Glover responsible for 279 grams of crack cocaine as foreseeable to him given his role in the conspiracy. Consistent with our case law, the comprehensive discussion of this issue at sentencing constitutes a sufficiently individualized inquiry. Further, given Glover's extensive involvement in the conspiracy and the evidence noted by the Government at sentencing, the District Court's determination was not an abuse of discretion.

## V.    Conclusion

For the foregoing reasons, we will affirm the defendants' convictions, the District Court's challenged evidentiary rulings, and the judgments of sentence.